# Lessee of James M'Teer, William M'Teer, William Adley and Elizabeth, his wife, Robert M'Teer, Joseph M'Teer and John M'Teer *against* Leonard Buttorff.

Improvement rights in early times, have been considered as chattels, to many purposes, and sold as such by executors and administrators. But as between vendor and vendee and their heirs, where no bill of sale has been given, the equitable right continues in the administrators, though possession has been delivered, where the consideration money has not been paid.

One claiming an improvement, and taking out a warrant including the same, and obtaining a survey, is in general concluded by the lines thereof ; but under certain circumstances, this rule does not seem to hold.

EJECTMENT for 226 acres, 148 perches of land, in East Pennsbro' township. The legal titles on both sides were as follow :

The plaintiff claimed under a warrant to William M'Teer, the father of the lessors, dated 7th September 1753, for 100 acres, including his improvement adjoining John M'Clellan and Adam *Calhoon, in East Pennsbro' township ; the said William, having paid on the 1st August 1753, to John Armstrong, deputy surveyor, 5l. to take out the warrant. [*301

On the 29th June 1767, the said William M'Teer entered an application for 100 acres, bounded by Samuel Huston, Adam Calhoon, and his other land. And on the 19th March 1768, a sur-

[M'Teer's Lessee *v.* Buttorff.]

vey was made on both rights of 226 acres, 148 perches, which was not returned into the office of the surveyor general.

The defendant held under a warrant to James Sharron, dated 23d February 1786, for 150 acres adjoining Adam Calhoon and others, including an improvement, interest to be computed from 1st February 1768; and a second warrant for 55 acres adjoining, dated 13th April 1787. Afterwards, on the 15th May 1787, surveys were made thereon, viz.: 165¼ acres on the first warrant, and 57⅝ acres on the second warrant. Upon the 19th June 1787, Sharron obtained a patent; and on the 1st August 1787, conveyed to the defendant in consideration of 255l., payable in instalments, with a claim of general warranty.

It appeared in evidence, that James Sharron, sen., had first settled and improved on the lands in question, and died thereon intestate. After his death, his nephew James Sharron, and another person, since deceased, took out letters of administration; and the improvement was appraised at 100l. They afterwards contracted with William M'Teer, sen., to sell him the improvement for 113l., and possession was delivered. No bill of sale appeared to have been executed therefor; but four bonds with security were given to the administrators, dated 7th May 1753, the first condition for the payment of 28l. on the 1st October 1753, and the other three for 28l. 6s. 8d. each, payable on the 1st October 1754, 1755 and 1756. The two bonds payable in 1753 and 1754, had been taken up and cancelled, but the payment of the two last was denied, and the same were put in suit against Dorcas M'Teer and Joseph M'Clure, administrators of William M'Teer, to January term 1773, against which the defendant set up a defence of want of consideration. The actions were continued on repeated rules for trial, and at length were stopped in August 1792, when the surviving administrator of Sharron paid the costs.

On the 17th December 1784, James Sharron, as surviving administrator, obtained an order of Orphan's Court to sell the improvement, containing 100 acres, more or less; the same was advertised as 150 acres, more or less, and sold to John Creigh, at public vendure, for 126l. A deed was executed to him on the 21st July 1785, for the improvement, said to contain 200 acres, more or less; and on the 1st November 1785, John Creigh *302] *re-conveyed to James Sharron, in consideration of 126l., the same quantity of land.

It further appeared in evidence, that William M'Teer, sen., died in 1770, and that his widow and children removed from the land in 1783, leaving a tenant on it, and that the buildings and fences were then much out of repair. Sharron alledged that he had applied for an order of Orphan's Court to enable him to sell, in pursuance of an agreement between the counsel in the actions on the bonds, in order to perfect the title; but his proof in this particular failed. It appeared, however, that his real as well as declared object in selling the lands, was merely to secure

the debt due to the estate of his uncle; that Creigh purchased for this purpose by his directions, and was desired to speak, and also to write to the family of M'Teer, who resided in different places, informing them that the title should be made over to them, on their payment of the two bonds and interest; and that Sharron afterwards actually offered to convey the land to James M'Teer, the eldest son, in trust for his brothers and sisters, upon his discharging the bonds, which the other peremptorily refused.

James Sharron settled his administration account in the register's office on the 22d August 1770, upon which there was a balance of 73l. 5s. 2d. due to the accountant; and the administrators and children of William M'Teer altogether resisted the payment of any money on account of the sale of the improvement. The defendant had made considerable improvements on the land, by erecting a new house and barn, and saw mill, and making meadow, and putting the fences in good order. Six small bonds, and a note due from him to Sharron, payable in the successive years from 1792 to 1797, amounting to 98l., were deposited in the hands of a third person, to await the event of this suit.

Under these facts, Messrs. C. Smith and Watts for the defendant contended, that the plaintiff must fail, as well on principles of law as of moral honesty.

Both the plaintiff and defendant claim under the original equitable title of improvement made by Sharron, sen.; and the warrants were taken out by both for the lands covered by the improvement, in order to acquire the legal title. How is it possible that the children of William M'Teer can recover the same, when they have neither paid nor tendered the money fairly due on their father's contract before they commenced their ejectment? No bill of sale was executed, and until the consideration money was fully paid or tendered, the equitable interest contin- *ued in the representatives of Sharron. Until this was [*303 done, no trust could result to the lessors of the plaintiff.

If William M'Teer had procured a survey, to be made under his warrant for 100 acres before 1765, when the new regulations as to surveys were adopted, he might have had the full quantity of 300 acres appropriated to him; the improvement right secured 300 acres to him before the American war, provided it interfered with no earlier rights. But he refrained from surveying more than his bare quantity, in order to save the interest on his purchase money from the time of the commencement of the improvement, and took out a new application for 100 acres. The lands of M'Teer were assets for the payment of his debts; and his children cannot inherit under him until his *bona fide* debts are discharged. If their ancestor received possession from Sharron under the contract, and they did not choose to abide by it, they ought to have delivered back the lands. Here, in

fact, Sharron has been reinstated in his right and possession by legal transfer. The sum for which he sold the lands will not extinguish his debt and the legal incidental expences. If the title derived from the sale of the administrators of Sharron was good, the personal representatives of M'Teer were bound to fulfil the contract ; if it was bad, the plaintiff founding his claim thereon, is not entitled to recover. But the M'Teers had it in their power to purchase at the public sale, and thereby put the right beyond all question. Nay, it was in fact offered to the eldest son, on payment of the bonds, before Sharron took out his patent. The defendant has made valuable improvements before the commencement of the ejectment in 1800 ; and it would be the height of injustice to strip him of them after such great delay and laches.

Messrs. Duncan and Bowie argued for the plaintiffs.

It cannot be denied that the plaintiff has the earliest legal title : his warrant, application and survey, are prior in point of time.

To this, it is contended that he has the superadded equitable right of improvement. Were it necessary, the law would presume, that a bill of sale was executed for it : but there is no such necessity.

In early times, before 1761 or 1762, lands held by improvement were considered as mere chattels, and passed by delivery of possession, in the same manner as a horse, or a cow would upon a sale. Repeated decisions have established, that executors without a power to sell under the will, and administrators without an order of Orphan's Court, could pass lands under the prevailing usage ; and fair sales, have always been sanctified. *304] *Here bonds were given with good security, and the money must be considered as actually paid. It was not an executory contract, and the default in not recovering the money, is attributable to Sharron. The absurdity is too gross, to assert, that Sharron by his own act, against the will of the lessors of the plaintiff, might resume the land, which he had sold, in order to pay his debt. M'Teer after laying the improvement, had a right to bargain with the proprietaries, and though Sharron has since obtained a patent, yet both he and the defendant are trustees for the heirs of M'Teer. The family were dispersed, and knew nothing of the sale under the order of Orphans' Court. Were it otherwise, they were not obliged to attend the sale ; inasmuch as the administrators of Sharron had before sold to their ancestor, the order was void in itself : but even this order authorized the sale of 100 acres of land only. Though the improvement was advertised as 150 acres, and conveyed as 200 acres more or less, still it must be resolved into the quantity, which the administrators were impowered to sell : and the warrant taken out by M'Teer in 1753, shews that the claim under the improvement did not exceed 100 acres. The object

of Sharron was not to re-convey to M'Teer's heirs, after he took
out his warrant on the 23d February 1786.   This warrant relin-
quishes the improvement made by his uncle ; because the inter-
est on the purchase money was to be computed from 1st February
1768, and his uncle died before 1753.   Admitting however that
this meditated fraud on the commonwealth could prevail, Shar-
ron is foreclosed by the survey made on his first warrant, calling
for the improvement, and he could convey to the defendant no
better right than he himself had.   If subsequent to his obtain-
ing his first warrant, another person had taken out a warrant for
the adjoining lands, must not Sharron have been contented with
his strict measure ?   And is not the application of William
M'Teer, expressly descriptive of the spot and made near 20
years before, entitled to the same preference ?   A warrant and
survey operate as notice to all the world, of the extent of the
party's pretensions, and he shall be bound thereby.   The plaint-
iff cannot be prejudiced by the sale to the defendant, who was
informed of the adverse claim before he has paid his money, and
has retained part of it to await the event of this suit : he may
moreover look to his general warranty for his indemnification.

YEATES, J. delivered the charge to the jury.

It is agreed, that the plaintiff's legal title has the priority ; but
the conflicting rights are grounded on the improvement claim of
pre-emption of James Sharron, which will greatly influence the
relative titles.

*It·has not been established, that it was agreed be-   [*305
tween the counsel in the two suits, that the surviving
administrator should apply to the Orphan's Court for an order
of sale to complete the title.   If that fact had been ascertained,
it would have been incumbent on the heirs of William M'Teer
to have bid in the land, or to have raised it so high, as after de-
ducting therefrom the monies due on the two bonds, the surplus
payable to them would have indemnified them for any expendi-
tures made on the land.

In the early state of the country, say before 1761 or 1762,
titles by improvement were considered to many purposes as chat-
tels, and sold as such by executors or administrators, to enable
them to pay debts or bring up children.   When these transac-
tions have been fair and honest, and the consideration money has
been applied to discharge debts or maintain children, they have
been always sanctified, as between the original parties, their le-
gal representatives and purchasers under them.   In progress of
time, when improvements came to be more respected, and sup-
posed to partake of all the qualities of real estate, the rules as to
their disposition, and particularly as the property of deceased
persons, were the same as those of patented or warranted lands.
But it would be difficult indeed to point out a single instance,
where it has been even supposed, that as between the original
purchasers of an improvement right, or their legal heirs, and the

vendors, the right would vest, unless the money contracted for had been paid, or a deed had been given transferring the interest. In all the cases which have occurred within my experience, or which I have heard of, the families of the deceased person, have reaped the substantial benefits of a fair sale, though conducted without the instrumentality of an Orphan's Court, or proper authority in the will. The honest equivalent has been the basis of the usage which formerly prevailed ; and without it, in the cases to which my remarks are confined, the heirs of an improver ought not to be stripped of their right. The present instance affords one great prominent feature, that the dispute rests between the children of the purchaser, who has not performed his contract, and the vendee of the administrator under a second sale.

Both M'Teer and Sharron ran great risque in taking out their first warrants for 100 and 150 acres of land. If a third person had obtained in the intermediate periods, a warrant for the adjoining lands, they would in vain have objected there to the extent of the improvement right. It is certainly true that Sharron practised a deception against the commonwealth, by carrying the interest on his purchase money only as far back as 1st February 1768, instead of the true commencement of his uncle's improvement. His vendee has the good fortune to avail himself of his possession.

*306] *The object of the order of Orphan's Court must necessarily have been to sell the whole improvement, with all its rights, to their fullest extent.

The case then stands thus. William M'Teer bought this improvement from the administrators of James Sharron, for 113l., and paid two bonds, amounting to 56l. 6s. 8d. Two other bonds of 28l. 6s. 8d. each, payable in 1755 and 1756, remained due, which were not sued until January term 1773, when defences were set up against them. The administrators of M'Teer contended then, they were not bound to pay, because their intestate had got no title by the sale. Now the heirs insist, that a right was vested thereby ; or in other words, that though the payment of more than one half of the consideration money had been resisted, they have all the equity of fair and honest purchasers. This is not easily swallowed. Notwithstanding all this, Sharron, the administrator, ought not, on moral principles, to derive any benefit from his sale under the order of Orphan's Court, beyond reimbursing himself for his expenditures.

The account might be thus stated :

|  | £. | s. | d. |
|---|---|---|---|
| Principal of the two bonds each 28l. 6s. 8d. | 56 | 13 | 4 |
| Interest on one bond from 1st October 1755, to 1st August 1787, when the lands were patented, 31 years and 10 months, - - - - - | 54 | 2 | 4 |
| Amount carried forward, - - - - | 110 | 15 | 8 |

[M'Teer's Lessee *v.* Buttorff.]

| | | | |
|---|---|---|---|
| Amount brought forward, - - - | £110 | 15 | 8 |
| Interest from 1st October 1756, to do. 30 years and 10 months, - - - - - - - | 52 | 8 | 4 |
| Purchase money of 222⅞ acres at 15l. 10s. per 100 acres, - - - - - - - - | 34 | 10 | 11 |
| Interest thereon, say for a year, - - - - | 2 | 1 | 4 |
| Sharron appears by the docket to have paid the costs of the two suits, - - - - - | 12 | 19 | 0 |
| | £.212 | 15 | 3 |

To this must be added the surveying and office fees and incidental expences; and the sums paid by defendant for the land by instalments, must be reduced to cash. The whole aggregate would amount at least to, - - - - - £.42 4 9

Consideration in the defendant's deed, £.255 0 0

So that though Sharron conceived himself driven to the necessity of an application to the Orphan's Court, he has been subjected to expences, instead of reaping any personal advantage therefrom. By the second sale, he intended to secure the *debts due to his intestate, and directed information to [*307 be given to the lessors of the plaintiff that the land would be conveyed to them, on their discharging the debts due thereon from the estate of their father. According to the account given by one of the witnesses, the same offer was personally made by Sharron to the eldest son in 1787, who wholly refused the same. His first warrant was taken out on the 23d February 1786. The other children were scattered about in different states.

After all this, ought an honest purchaser, who has made many and valuable improvements, without notice, be disturbed in his possession after a lapse of many years? The plaintiff's counsel urge, that he may avail himself of his general warranty, and the 98l. yet remaining unpaid of the purchase money. But it is highly questionable, whether he could intitle himself to compensation for his improvements under the covenant of general warranty. This point is *sub judice,* in three cases in bank.

The only real difficulty respects the 57⅝ acres, surveyed on Sharron's second warrant, whether the plaintiff is not intitled thereto under his prior application and survey? If their application had been taken out between the first and second warrants of Sharron, I should have deemed it intitled to a preference, if it had been prosecuted in a reasonable time by a survey. But, considering that Sharron the elder would have been intitled to 300 acres by virtue of his settlement and improvement, under the usage of the proprietary land office, that the refusal by William M'Teer and his representatives to pay a just debt has led to the present difficulty, and more especially that the conduct of William M'Teer in taking out an application in 1767, could not

4 YEATES—19

possibly be influenced by any thing done subsequently, and consequently that his money was not paid from a confidence of any foreclosure as to any future adverse right, I incline to think, thar for these 57⅝ acres also, a verdict, should pass for the defendant. The children of M'Teer should have tendered the money due from their father, before they could hope to convert the defendant into a trustee.

                          ¯ Verdict for the defendant.